# EXHIBIT 6



SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
202.383.0100  Fax 202.637.3593
www.sutherland.com

NICHOLAS T. CHRISTAKOS
DIRECT LINE: 202.383.0184
E-mail: nicholas.christakos@sutherland.com

September 5, 2014

VIA FACSIMILE AND U.S. MAIL

Brett D. Orlove, Esq.
Grossberg, Yochelson, Fox & Beyda, LLP
2000 L Street, N.W.
Suite 675
Washington, DC 20036-4907

Re:   1401 New York Avenue, NW, Washington, D.C. --
      Lawyers' Committee for Civil Rights Under Law Lease

Dear Mr. Orlove:

    We met at the presentation that you and other representatives of Minshall Stewart Properties ("MSP") conducted at the Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee"), on August 11, 2014, regarding the Landlord's planned renovation of the building.  I am a member of the Executive Committee of the Board, and serve as General Counsel to the Lawyers' Committee.  I write to follow up on the presentation.

    It appears that the purpose of the presentation was, in substantial part, to ease any concerns the Lawyers' Committee may have with respect to the anticipated business disruption arising from the planned renovation.  In that regard, MSP expressed the Landlord's willingness to conduct the renovation in one of three possible ways so as to address such concerns.  However, the message was clearly delivered that, regardless of those concerns or whether the Lawyers' Committee deemed any of the three proposals adequate, the Landlord will proceed with the renovation as presently scheduled under the belief that it is has the unfettered right to do so under the Lease.

    We respectfully disagree with the Landlord's apparent construction of the Lease.  Under the Lease and applicable law, the Landlord must use reasonable efforts to avoid disruption of the Lawyers' Committee's business operations during any such renovation.  Given the highly disruptive nature of the planned renovation, which includes removal and replacement of the building skin and base building HVAC system, the Landlord's proposed alternatives for minimizing the anticipated business disruption are not reasonable under the circumstances.  There are other, far more reasonable alternatives that have been sanctioned under the case law in

Brett D. Orlove, Esq.
September 5, 2014
Page 2

similar circumstances and should be made available to the Lawyers' Committee here. We amplify these views below.

## The Lease and Pertinent Legal Principles

The starting point for further discussion is a review of the Lease and pertinent legal principles. Sections 15.01 and 15.02(a) permit Landlord: (i) to enter the Premises for the purpose of making alterations or repairs as deemed necessary; (ii) to perform "substantial" renovations in and to the building, including the façade, and to access the Premises for purpose of performing such repairs or renovations; and (iii) not to incur liability or abatement of rent in connection with such renovations. However, the Lease also obligates Landlord to use "reasonable efforts" to "avoid disruption" of the Tenant's business during any such entry onto the Premises. Lease § 15.02(b). This "reasonable efforts" provision provides an outer boundary on the Landlord's renovation rights. That same outer boundary is well established in District of Columbia case law. *See Towers Tenant Ass'n, Inc. v. Towers Limited Partnership*, 563 F. Supp. 566, 570 (D.D.C 1983) (when a landlord begins renovations and improvements, "he owes a duty to his tenants to exercise reasonable care in the performance of those activities"). The Lease also provides a right of quiet enjoyment, subject to the lease terms (Lease § 24.04), which must necessarily include the foregoing outer boundary on the Landlord's renovation rights.

*Stinson, Lyons, Gerlin & Bustamante v. Brickell Bldg. 1 Holding Co., Inc.*, 747 F. Supp. 1470 (S.D. Fla. 1990), *aff'd*, 923 F.2d 810 (11th Cir. 1991), provides important guidance with regard to what constitutes "reasonable effort" not to disturb a law firm during building skin replacement. In that case, the court evaluated whether the landlord's efforts to exercise its contractual rights to repair and renovate, including replacement of the office building's skin, were carried out "in a reasonable and responsible manner" with respect to impact on a tenant law firm, which sued for breach of the implied covenant of quiet enjoyment. The court looked to the landlord's proposed accommodations to the tenant, which included: (i) building out and moving the tenant to renovated space on a floor above the firm's existing space, at landlord's expense, with tenant free to depart at the end of the lease term or to negotiate a new lease; (ii) paying the tenant's moving expenses to a comparable office building nearby and paying any rental increase; or (iii) allowing the tenant to terminate the lease with a cash payout of $350,000 from the landlord.

The court concluded that the landlord's proposed accommodations were reasonable. On that basis, the court held that the landlord had not breached the tenant's covenant of quiet enjoyment and, despite the lease provision precluding claims for repairs, that the firm was entitled to a 20% rent abatement during installation of the building skin.

We believe the *Stinson* case provides guidance for Landlord's approach to this renovation against which its proposals should and will be measured.

Brett D. Orlove, Esq.
September 5, 2014
Page 3

## Landlord's Proposals

Against the foregoing legal backdrop we now turn to the Landlord's proposals. We note at the outset that the building recently underwent an extensive common area, public corridor, restroom and exterior cosmetic renovation, just before purchase of the building by the current Landlord. The Lawyers' Committee thus has already had to live through one significant renovation, in the recent past. The proposed renovation now on the table is far more extensive and indisputably disruptive to any tenant's business operations. Among other things, Landlord plans to replace the entire external façade with a floor-to-ceiling window configuration on each floor. Focusing on the plan described by MSP on August 11, we understand that replacement of the building skin will occur vertically in four sequential phases, with one quarter of the building from top to bottom under renovation at any given time. Each vertical renovation phase is expected to last approximately 90 days, resulting in ongoing external façade work over the course of an entire year. In addition, the Landlord has plans to simultaneously completely replace the base building mechanical system. This work will also be very invasive, requiring the removal of all perimeter heat pump units in every office currently occupied by Lawyers' Committee attorneys and staff. Once removed, we understand that a new water fed plenum based HVAC system will be installed, which will involve additional work throughout the interior and exterior zones of the 4th and 5th floors. In short, the renovation communicated at the August 11, 2014 meeting is intended to be an extensive and invasive incursion into Lawyers' Committee offices.

As you know, the Lawyers' Committee is a fully functioning law firm, conducting the same type of business operations as any other law firm. It also engages in significant public policy work, and its operations are national in scope and highly visible in the legal and policy arenas. A detailed description of the nature of the Lawyers' Committee's work, and the reasons why such a renovation would have an unacceptably disruptive impact on the business operations of the Lawyers' Committee, may be found in the letter from our Executive Director to MSP dated July 29, 2014 (a letter to which the Lawyers' Committee has received no substantive response), and will not be repeated here. Suffice it to say that requiring a tenant to remain in the space and attempt to conduct business operations during the extensive and intrusive renovations contemplated here is wholly inconsistent with Landlord's "reasonable efforts" obligation under the Lease.

To date, Landlord has offered three options for "accommodating" the Lawyers' Committee during the work, none of which is satisfactory. They are:

1. Erecting "an insulated temporary partition" within the Premises while the Lawyers' Committee remains in place on the fourth and fifth floors of the building, which would expose its personnel to excessive noise, dust, and other nuisances related to the renovations;

24492685.2

Brett D. Orlove, Esq.
September 5, 2014
Page 4

2. Moving a quarter of Lawyers' Committee's staff to alternative space every 90 days, purportedly to avoid the renovation noise and nuisance occurring in that quarter of the building; or

3. Conducting the building skin renovations from outside rather than inside the Premises and erecting a smaller protective wall, again, exposing Lawyers' Committee personnel to various sources of disturbance.

Landlord has represented that it will attempt to conduct work at night and on weekends. However, as MSP acknowledged during the August 11 meeting, a nearby hotel may prevent Landlord from obtaining a permit to conduct work during those times, requiring the work to be conducted during business hours. Moreover, even if such a permit were obtained, Lawyers' Committee staff often work nights and weekends, which would render that accommodation unsatisfactory.

### Lawyers' Committee Proposals

The Lawyers' Committee has suggested to MSP two alternatives: (i) termination of the Lease, which would allow the Lawyers' Committee to move to new space of its choosing, or (ii) relocation of the Lawyers' Committee to new space at 2001 L Street NW, in which Landlord has an ownership interest, on terms reflecting the inconvenience and disruption to the Lawyers' Committee. Landlord has rejected both alternatives, and has not offered any new or different possible solutions.

In the spirit of compromise, the Lawyers' Committee is willing to consider another alternative. The Landlord could complete the renovation of two adjoining floors elsewhere in the building first, such as the 9th and 10th floors where there currently exists a connecting internal stairwell comparable to the one currently connecting the Lawyers' Committee's floors. Upon completion of those floors, the Lawyers' Committee would relocate there permanently until the end of the Lease term, and the Landlord would proceed to finish the remainder of the building without the need to further enter the Lawyers' Committee's new space. Relocation to the 9th and 10th floors would be a one-time, single phase relocation. This would keep the attorneys and other staff working together at all times, while minimizing the noise and disruption factors to the extent possible. While the Lawyers' Committee would greatly prefer to end the Lease and leave the building before the renovations begin, we offer this alternative as something the Lawyers' Committee believes it can tolerate if it is to remain in the building during renovations.

You will note that the Lawyers' Committee proposals, including the new proposal outlined above, track the proposals made by the landlord in *Stinson*, all of which were found by the court to be reasonable in the face of a similarly disruptive renovation. Indeed, not only did the *Stinson* landlord expressly offer the alternative we now suggest above, that landlord also offered substantial economic incentives for that law firm tenant to move out. Your client has offered nothing of the sort.

24492685.2

Brett D. Orlove, Esq.
September 5, 2014
Page 5

\* \* \* \* \* \*

In recent days, Landlord's representatives have suggested to Lawyers' Committee staff in hallway conversations that the construction plan may change. Needless to say, the manner in which the renovation will be conducted is of paramount importance. So that we can continue to evaluate Landlord's proposals, and perhaps refine our own approach to the issues, we ask that MSP provide, at the earliest opportunity, (i) the site plan; (ii) floor plans; and (iii) all tabulation data required for the building permit, including code information and zoning calculations. We would also like to have an opportunity to meet with the contractor after review of the foregoing items, and invite you to participate in a meeting with the contractor so that we can be sure that both parties have the same understanding with regard to the planned renovations and the anticipated disruptions. We are available on mutually convenient dates and times in the next two weeks to meet with the contractor, and request that you advise us of available dates/times by September 10. We suggest that the meeting occur in the Lawyers' Committee's offices so that we can better understand the specific impact the renovation work will have on our space.

In the meantime, we must continue to assume that the Landlord intends to commence the most disruptive part of the renovation in January 2015, in the manner described on August 11. We therefore also ask that MSP engage in a meaningful discussion of the options presented by the Lawyers' Committee at its earliest opportunity, with the goal of reaching agreement during the month of September. Such agreement should also contemplate, as was made clear in the Lawyers' Committee's July 29 letter, that any relocation from the building will take a minimum of six months from a new signed lease, provided all construction documents are completed, to implement. As noted above, Landlord must satisfy its Lease obligation to use "reasonable efforts" to "avoid disruption" of the tenant's business if it is to proceed with the extensive planned renovation, but it has yet to make or seriously consider a proposal that would be reasonable under these circumstances. We are available to meet with you over the next two weeks to discuss options. Please advise as to which dates and times work for your team.

Our broker, West, Lane & Schlager, stands ready, and has been for the last several weeks, to discuss the matter further and fully vet each of the Lawyers' Committee proposals. We urge your client to engage meaningfully in such an effort, rather than simply adhere to the unacceptable options MSP has already proposed and continue to ignore the Lawyers' Committee's proposals. Without a good faith response, the Lawyers' Committee will be forced to investigate other means by which to enforce its rights under the Lease.

Brett D. Orlove, Esq.
September 5, 2014
Page 6

    We look forward to hearing from you and discussing a potential resolution.

        Sincerely,

        Nicholas T. Christakos

cc:    Barbara Arnwine
       Jon Greenbaum
       Joe Moore
       Gary Schlager
       Ganon Rich
       Marc Fleischaker
       Barbara S. Wahl
       Karen Ellis Carr